## FITZPATRICK *v.* FITZPATRICK.

## (*Nashville.* December Term, 1914.)

1. **DIVORCE: Pleadings. Complaint. Verification. Statute.**

   Where the complaint was otherwise sufficient, but for divorce the verification required by Shannon's Code, sec. 4206, prescribing verification of divorce complaints by affidavit making certain statements, was defective in omitting the word "levity," and in substituting the word "purposes" in place of the required "causes," the defects were not fatal, but the chancellor should have allowed their amendment. (*Post; pp.* 56, 57.)

   Code cited and construed: Secs. 4203, 4206 (S.).

   Case cited and distinguished: De Armond v. De Armond, 92 Tenn., 40.

   Case cited and approved: Hackney v. Hackney, 28 Tenn., 450.

2. **DIVORCE. Pleadings. Amendment of affidavit verifying complaint. Time.**

   In view of the State's liberal rules as to amendment of pleadings, an offered amendment to cure a verbally defective affidavit verifying a complaint for divorce was not too late, when offered during the trial of the issue raised by the plea in abatement; the defendant not having been prejudiced by the delay. (*Post, p.* 57.)

3. **DIVORCE. Statute. Two years' residence as prerequisite to right of complainant to avail herself of respondent's acts in another State.**

   Although complainant in divorce has not resided in this State for two years, if her complaint sets out sufficient facts as having taken place in this State to justify a decree by themselves, the complaint is good; but to take advantage of acts occurring in another State she must have resided here for the two years next preceding the institution of her action. (*Post, pp.* 57-63.)

   Case cited and distinguished: Carter v. Carter, 113 Tenn., 509.

Fitzpatrick v. Fitzpatrick.

4. **DIVORCE.   Pleadings.   Allegations of complaint.   Sufficiency under statute.**

Allegations in a complaint for divorce that defendant became drunk, that he cursed his wife and her family, that he left her at the home of her parents, saying that he should not return, being sober at the time, that he accused complainant of lying when she told him that she had opened a letter of his only by mistake, and threatened to report her to the postal authorities, that he finally left complainant at her parents' home in Nashville, and returned to his own in Philadelphia, and had not returned, that he had contributed nothing to the support of complainant and their child, and that he had published in the Nashville papers notices that he would not be responsible for her debts, giving her maiden as well as her married name, are allegations of cruel treatment and failure to provide sufficient to justify a divorce from bed and board at least, under Shannon's Code, sec. 4202, providing that it shall be a ground for divorce from bed and board of the bonds of matrimony in the discretion of the court (1) if the husband by cruel treatment renders it unsafe or improper for the wife to cohabit with him, and (3) if he has refused or neglected to provide for her.   (*Post, pp.* 57-63.)

5. **DIVORCE.   Service of process issued under defective pleading.   Effect.**

Service of subpoena to answer, served wth copy of bill in a divorce action, upon a nonresident respondent temporarily in the State, was good, and gave jurisdiction of the person, though the affidavit verifying the complaint was verbally defective, at least to permit amendment of the verification.   (*Post, pp.* 64, 65.)

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County.—JOHN ALLISON, Chancellor.

P. D. MADDIN, for appellant.

STOKES & STOKES, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This is a divorce proceeding.

The questions to be determined arise upon a plea in abatement filed by the defendant, to the effect that the grounds of divorce set out in the bill occurred in the State of Pennsylvania, where both parties had their domicile, and that the complainant had not resided in this State for the period of two years, as required by Shannon's Code, section 4203. Another ground stated in the plea was that the affidavit to the bill was fatally defective, because not in conformity with Shannnon's Code, section 4206, in that there was omitted from the affidavit the word "levity," and that for the word "causes" was substituted the word "purposes."

The bearing of the defects suggested will be readily perceived from the language of the section requiring the affidavit, viz.:

"The bill shall be verified by an affidavit, upon oath or affirmation, before a justice of the peace, or the judge or clerk of the court, that the facts stated in the bill are true to the best of the complainant's knowledge and belief, and that the complaint is not made out of levity, or collusion with the defendant, but in sincerity and truth, for the causes mentioned in the bill."

In *De Armond* v. *De Armond,* 92 Tenn., 40, 20 S. W., 422, it was held that the two defects mentioned, both of which occurred in the proceedings in that case, were fatal to the bill, inasmuch as no amendment had been made in the court below. In the case before us an amendment was offered, correcting the defects suggested; but the chancellor refused to permit this amendment to be made.

We are of the opinion that the amendments should have been allowed by the chancellor, if the bill otherwise contained allegations sufficient to justify the granting of the divorce. It is plainly intimated in the case last cited that such an amendment should be allowed, and in the case of *Hackney* v. *Hackney,* 9 Humph. (28 Tenn.), 450, it was held that the affidavit might be amended.

It is insisted that this amendment was not offered early enough. It appears that it was offered during the trial of the issue raised by the plea in abatement. In strictness, it should have been offered as soon as the plea was filed, or shortly thereafter; but we think, in view of the liberal rules prevailing in this State upon the subject of amendments, it did not come too late when finally offered, inasmuch as the defendant was put to no disadvantage by the delay.

The next question is whether there is enough in the bill to justify the granting of a divorce aside from the facts which are alleged to have taken place in Pennsylvania. If facts sufficient for the purpose occurred in this State, the divorce could be properly granted,

although the complainant had not resided in the State for two years. *Carter* v. *Carter*, 113 Tenn., 509, 82 S. W. 309. The complainant not having resided in this State for two years next before the filing of the bill, the facts that occurred in Pennsylvania cannot be considered.

The allegations of the bill are as follows:

"Complainant would respectfully show to the court that on the 2d day of November, 1912, she was married to the defendant in the city of Nashville; that complainant had known the defendant for a period of about seven years before she married him; that he never resided here, but came here frequently on visits, and in that way complainant met and married him; that at the time of their marriage the defendant resided in the city of Philadelphia aforesaid, and immediately after their marriage she and the defendant left for his home in Philadelphia.

"The defendant had told complainant repeatedly before their marriage and up to the date of same that he was engaged in the hotel business in the said city of Philadelphia; that when he and complainant reached their home, in place of being a hotel, it was a drinking house or saloon; that the drinking house or saloon was in the basement, and home above. Complainant was taken to live with the defendant, who had with him at the time two sisters, one a widow and the other an old maid. Complainant was very much disappointed and aggrieved when she found that her husband had told her a falsehood regarding his business and the environ-

ments and surroundings into which he took her as aforesaid. Complainant, however, determined still to live with defendant, notwithstanding these conditions, and make him a good and faithful wife; but it was not long before she realized that he was addicted to periods of drinking, and would sometimes be so much under the influence of it that he forgot, or became unmindful of, the duties of a husband or the rights of a wife; that he would come into her room in his drunken condition and be exceedingly abusive and profane; that complainant continued to live with him under these conditions and environments until January, 1913, when she and the defendant came to Nashville on a visit to her people; that they reached here on Thursday night, and went at once to the home of her father and mother; that on Sunday immediately following their arrival in the city the defendant had one of his periodical sprees of drunkenness, and came to her father's home in that condition; that without any provocation or cause whatsoever he engaged in a great deal of profanity, cursing and abusing the different members of her father's family, and more especially her mother and complainant herself; that he remained at her father's house that Sunday night, and left early next morning before breakfast, stating that he did not intend to come back any more, or have anything to do with complainant's family. He claimed that he was not drunk at the time, and his anger on Monday morning, or pretended anger, was because they said he was drunk the preceding Sunday.

"Complainant would further show to the court that on the next day the postman brought some mail to the home of her father, and among the letters handed one to complainant, stating that 'this is for that Irish lady'; and complainant, seeing the name 'Fitzpatrick' on the back of the envelope, hurriedly opened it without noticing whether it was addressed to her or defendant; that when she started to read the letter she saw at once that it was intended for the defendant and did not read it. That night (Monday), when defendant came back, stating that he had come for his clothes, complainant handed him the letter and told him how she came to open it, and that she did not read it. The defendant grew very angry, accusing complainant of telling him a falsehood, and stated that he intended to report the matter to the postal authorities and have them take it up on account of her opening his mail.

"Complainant would further show to the court that the defendant left that Monday night, taking part of his clothes with him and sending for the remainder of them the following Tuesday night; that defendant remained in the city until the last of the week, possibly Thursday night; that he did not come to see complainant any more during the time; that he called her up several times over the telephone, but she declined to discuss the matter with him over the telephone, and he then asked complainant to come up town and meet him somewhere there. This she declined to do, and told him, if he wanted to see her, to come out to her home and she would talk with him. This defendant declined to do

and went back to his home in Philadelphia.  This oc-
curred about the 22d or 23d of January last.

"Complainant further alleges and charges that since
defendant left, on the date above stated, he has con-
tributed nothing whatsoever to her maintenance and
support, and in addition to that he has published twice
in the papers at Nashville that he would not be responsi-
ble for any debts complainant might contract, and in
this way has sought to prevent her from getting credit
in the city, all of which will be shown to the court by
proof; that in one publication he not only published her
married name, but also her maiden name, so as to
identify who he meant.  Complainant therefore alleges
and charges, in view of the foregoing facts and others
to be shown on the hearing, that defendant is an
habitual drunkard; that he is guilty of such cruel and
inhuman treatment and conduct towards complainant
as renders it unsafe and improper for her to cohabit
with him and be under his dominion and control; that
he has offered such indignities to her person as to ren-
der her condition intolerable, and therefore she has
left him, being forced thereto by his conduct, and the
defendant has refused and neglected to provide for
complainant, having contributed nothing for the past
seven months.

"Complainant would further show to the court that
on the 13th of August last, as fruits of her marriage
with defendant, she gave birth to a child, a boy named
Thomas Burns; that she and her child are now living
with her father and mother in Nashville; that the de-

fendant has contributed nothing towards the support of complainant or her child in any way, form, or fashion; that the defendant is now temporarily in the city of Nashville.

"Complainant would show to the court that the defendant, as she is informed, believes, and so charges, is a man of considerable wealth; that the business he is engaged in is lucrative, and complainant was informed while she was living in Philadelphia that the defendant had a business worth $40,000."

After omitting the complainant's conduct in Pennsylvania, and his falling into habitual drunkenness, which must have occurred there likewise, we have left the facts in this State, that the defendant became drunk and cursed and abused his wife, also her mother and the different members of her father's family, all of which we infer occurred in her presence; that he left, saying he did not intend to return any more, at this time being perfectly sober; that when complainant inadvertently opened a letter addressed to him, which afterwards she explained to him, he angrily accused her of telling a falsehood, and threatened to report her to the postal authorities; that he finally left and declined to visit her again; that he has since contributed nothing to her support, or to the support of her child, and has caused to be published twice in the Nashville papers a statement that he would not be responsible for any debts she might contract, not only publishing her married name, but also her maiden name.

Here we have allegations of cruel treatment in this State, and also failure to provide, which we think are sufficient, under our statute, to grant a divorce from bed and board at least, if not from the bonds of matrimony.

Our statute provides as follows:

"The following shall be causes of divorce from bed and board, and from the bonds of matrimony, at the discretion of the court:

"(1)  That the husband is guilty of such cruel and inhuman treatment or conduct towards his wife, as renders it unsafe and improper for her to cohabit with him, and be under his dominion and control.

"(2)  That he has offered such indignities to her person as to render her condition intolerable, and thereby forced her to withdraw.

"(3)  That he has abandoned her, or turned her out of doors, and refused or neglected to provide for her." (Shannon's Code, section 4202.)

We are of the opinion that the allegations as to the husband's cursing the wife, and also her mother in her presence, and his making publications concerning his wife in the manner stated, are sufficient under the first subsection, and that the allegations concerning his failure to provide for her are sufficient under the third subsection.

So we think there was enough in the bill as to the conduct of the defendant in Tennessee to justify the granting of a divorce from bed and board, and at the discretion of the court from the bonds of matrimony, if proven.

Recurring to the affidavit:

It is insisted that, inasmuch as it is the duty of the court to dismiss a divorce bill that is not supported by the statutory affidavit, the chancellor had no jurisdiction of the controversy, and could do nothing but dismiss. This contention ignores the right of the chancellor to permit an amendment. Certainly he had jurisdiction for the purpose of permitting any amendment that would bring either the body of the bill or the affidavit into proper form.

It is insisted that inasmuch as the defendant was a nonresident, and the bill was served on him with a defective affidavit while he was temporarily in this State, jurisdiction was not acquired of him, and for this reason an amendment could not afterwards be made. This is an incorrect view. He was brought into court by a subpoena to answer, served on him along with a copy of the bill, and the court thus acquired jurisdiction of his person. It is true at this time the bill was so drawn, treating the affidavit as a statutory part of the bill under the authority of *De Armond* v. *De-Armond,* supra, that no cause of action was stated; yet it might just as well be argued that in no case could a bill be amended so as to state a cause of action without the issuance and service of new process, which is manifestly incorrect. It is a matter of frequent occurrence in courts of equity that on demurrer or motion to dismiss a bill is found so defective that it states no cause of action at all, yet amendments are allowed to be made on proper terms, bringing in the amended matter and

Fitzpatrick v. Fitzpatrick.

thus saving the bill. In no such case is it required that a new process shall be issued to again bring the defendant into court.

We are of the opinion, therefore, that the court of civil appeals acted correctly in reversing the chancellor, and remanding the cause for amendment of the affidavit and for answer and further proceedings.